CARPENTER

v.

MASON et al.

2003-Ohio-6490.]

Court of Common Pleas of Ohio,
Probate Division, Summit County.

No. 2003 CV 190.

Decided Nov. 26, 2003.

William Travis McIntyre, for plaintiff Ernest Carpenter.

Wallace W. Walker Jr., for defendant Josiah L. Mason, Guardian.

BILL SPICER, Judge.

{¶ 1} This matter comes before the court following a hearing held on November 24, 2003, on the complaint filed November 17, 2003, pursuant to R.C. 2133.08, by William Travis McIntyre, attorney for Ernest Carpenter, the son of Gerald Carpenter.

{¶ 2} Gerald Carpenter is an 82–year–old man who is currently a patient in the Intensive Care Unit ("ICU") at Akron City Hospital, which is located in Summit County, Ohio. Mr. Carpenter was admitted to Akron City Hospital on September 7, 2003, following transport from Samaritan Hospital in Ashland, Ohio, for an opinion from neurosurgery. At the time of admission, Mr. Carpenter was a resident of the Crystal Care Center in Ashland, Ohio.

{¶ 3} Upon admission to Akron City Hospital, Mr. Carpenter was nonresponsive. It was determined that Mr. Carpenter had suffered from an intracranial bleed or a hemorrhage in the brain. Mr. Carpenter was placed on a ventilator and a feeding tube was inserted down his throat. A subsequent CT scan performed two weeks later revealed that Mr. Carpenter had suffered from two additional intracranial bleeds since admission to the hospital.

{¶ 4} It is clear that Mr. Carpenter is in a permanently unconscious state and would not be able to survive outside a hospital ICU.

{¶ 5} Mr. Carpenter is intubated, meaning that he has a tube that runs down his throat and into his lungs to protect his airway. Mr. Carpenter requires frequent suctioning and is on antibiotics for an infection. In addition to being intubated, Mr. Carpenter has a tube that runs down his throat and into his stomach for feeding, as he cannot eat or swallow. Mr. Carpenter responds only to painful stimuli. Mr. Carpenter does not respond to any commands, nor does he attend to voice. Mr. Carpenter is currently breathing without a ventilator. However, as Mr. Carpenter has had three to four bouts of pneumonia during this hospitalization, due to his age, overall weakness, and inability to protect his airway, it is believed that he will again require mechanical ventilation within a short period of time.

{¶ 6} Dr. Steven Radwany is board certified in internal medicine, geriatric medicine, and palliative medicine. Dr. Radwany is currently the Chair of the Akron City Hospital Ethics Committee, the Associate Director for the internal medicine residency, and the Medical Director of Palliative Medicine. For the past 17 years, Dr. Radwany has been involved with the ICU at Akron City Hospital. Dr. Radwany testified that approximately two weeks after Mr. Carpenter was admitted to Akron City Hospital, the Ethics Committee was consulted regarding him. The Ethics Committee, which is composed of community members, clergy, and hospital professionals from social work, nursing, and medicine, convenes at the request of primary physicians, family, or staff to give support during a decisional crisis. Dr. Radwany testified that after review, it was the unanimous opinion of the Ethics Committee that Mr. Carpenter has no chance for significant recovery and that it would be reasonable to stop all invasive life-sustaining measures. That recommendation has been made known to the family of Mr. Carpenter. Furthermore, Dr. Radwany also testified that in reaching its decision, the Ethics Committee did take into consideration Joint Exhibit 1, the form that Mr. Carpenter executed upon his entering the Crystal Care Center, and found that everything had been done medically that could improve the outcome for the patient.

{¶ 7} Based upon a reasonable medical certainty, it is the consensus of Dr. Radwany along with four critical-care specialists, including Dr. Traeger, as well as a neurologist, that Mr. Carpenter will not improve from the current state he is in. Dr. Radwany opined that based upon a reasonable medical certainty, Mr. Carpenter is terminal because he cannot protect his airway. As a result, Mr. Carpenter will get recurrent infections, will require mechanical ventilation, and will likely die within the next several weeks or months. It is the recommendation of Dr. Radwany, along with the other physicians, that Mr. Carpenter be kept comfortable and that no surgical procedures be performed to prolong the dying process. In support of that recommendation, Dr. Radwany stated that the

doctors believe that it would be cruel and would simply cause more pain to a patient who is capable only of feeling pain.

{¶ 8} By all accounts, Gerald Carpenter led a very frugal life. While his estate is valued at nearly $300,000, his residence in Mifflin, Ohio, is valued at only $5,000. Described as a hermit, Mr. Carpenter had an out house, got his water from a water heater next to the kitchen sink, and had no telephone. Ernest Carpenter testified that his father did not like doctors and that he would buy over-the-counter medication to help with his arthritis. Ernest Carpenter could recall his father going to the hospital only once when he had a perforated bowel. Ernest Carpenter further testified that, approximately 15 years ago, he had had a conversation with his father regarding being hooked up to machines, wherein his father stated that "he did not want to live that way" and that "that's not living." Such a statement is consistent with the testimony of Dr. Radwany that the vast majority of people who complete a declaration regarding the use of life-sustaining treatment when in a permanently unconscious state forgo such treatment. Tammy Schultie, the granddaughter of Gerald Carpenter, testified that although she never spoke about the subject of life-sustaining treatment with him, she believes that knowing him, he would not want to live in the state that he is in.

{¶ 9} Tiffany Behrendsen is the Director of Nursing at the Crystal Care Center in Ashland, Ohio. Tiffany Behrendsen testified that when Mr. Carpenter entered the Crystal Care Center on June 13, 2003, because of his arthritis, she handled the intake and helped fill out all of the paperwork, including the form that is marked as Joint Exhibit 1. Joint Exhibit 1 is a form that Mr. Carpenter signed, which indicates that he reviewed and discussed the "DNR options" and requested a "FULL CODE" status. On the bottom of the form, Tiffany Behrendsen quotes Mr. Carpenter as stating, "Don't let me die, do everything you can." It is because of this form that the Guardian has refused to follow the recommendations of the physicians and family of Gerald Carpenter and allow him to die from the underlying cause of his condition.

{¶ 10} It is clear from the testimony of Tiffany Behrendsen, though, that when she discussed the subject form with Gerald Carpenter, she spoke only in the context of what the nursing home would do if he suffered a heart attack. Tiffany Behrendsen explained to Mr. Carpenter that if he chose the "DNR" option and had a heart attack, they would do nothing but keep him comfortable. On the other hand, Tiffany Behrendsen explained to Mr. Carpenter that if he chose the "Full Code" status and had a heart attack, they would give chest compressions and call for an ambulance. Tiffany Behrendsen further explained that a tube may be inserted and that a machine might be used to breathe for him. Explained in this context, it is reasonable to expect that a man who was suffering only from arthritis would choose the option that he did. At no time did Tiffany

Behrendsen explain the options to Mr. Carpenter in the context of terminal illness or if he were in a permanently unconscious state.

{¶ 11} Gregory Latham testified that he owns a store across from Mr. Carpenter's residence and that he has known him for 17 years. During the last couple of years Mr. Latham would take Mr. Carpenter to town and to the bank. When Mr. Carpenter entered the nursing home in June, Mr. Latham began to help him pay his bills. Mr. Latham recalled a conversation he had with Mr. Carpenter, wherein he asked Mr. Carpenter whether he would be interested in purchasing a cemetery lot. Mr. Carpenter had responded that he did not need to purchase a cemetery lot because he was not going to die. Mr. Latham had no conversations with Mr. Carpenter regarding what his wishes would be if he were in a terminal or permanently unconscious state. Mr. Latham described Mr. Carpenter as set in his ways but could not say whether he would want to be hooked up to life support.

{¶ 12} When Gerald Carpenter was admitted to Akron City Hospital, the staff was unable to locate family members who could make decisions. As a result, the Ashland County Probate Court was contacted, and attorney Josiah L. Mason was appointed by that court as emergency guardian on November 2, 2003. Thereafter, the emergency guardianship was extended for an additional 30 days, and Mr. Mason was ultimately appointed as the Guardian of the Person and Estate of Gerald Carpenter on November 4, 2003. Since his appointment as Guardian, Mr. Mason has seen Mr. Carpenter only one time, for a period of approximately one-half hour.

{¶ 13} It is the position of Mr. Mason that, as Guardian, he does not have the authority to authorize the hospital to withdraw life-sustaining measures and allow Mr. Carpenter to die from the underlying cause of his condition because of the form that Mr. Carpenter executed when he entered the Crystal Care Center. In furtherance of this position, Mr. Mason has had conversations with Dr. Radwany and has sent letters to Dr. Traeger and Dr. Radwany demanding that Mr. Carpenter be put back on a ventilator and that a tracheotomy or whatever other procedures are necessary be performed to prolong his life.

{¶ 14} R.C. 2133.08(E)(1) provides that an individual who is objecting to a priority individual's consent to the use or continuation of life-sustaining treatment is to file a complaint in the county in which the "patient is located for the issuance of an order reversing the consent of the priority individual." R.C. 2133.08(E)(2) further provides:

"* * * [T]he court only may reverse that consent if the objecting individual establishes, by clear and convincing evidence * * * one or more of the following:

"* * *

"(c) The decision to use or continue life-sustaining treatment is not consistent with the previously expressed intention of the patient as described in division (D)(2) of this section.

"(d) The decision to use or continue life-sustaining treatment is not consistent with the type of informed consent decision that the patient would have made if he previously had expressed his intention with respect to the use or continuation, or the withholding or withdrawal, of life-sustaining treatment should he subsequently be in a terminal condition or in a permanently unconscious state, whichever applies, and no longer able to make informed decisions regarding the administration of life-sustaining treatment as described in division (D)(3) of this section."

{¶ 15} After careful review of the lengthy testimony in this matter, and the applicable law, the court hereby reverses the consent of Josiah Mason to the use or continuation of life-sustaining treatment for Gerald Carpenter. First, the court finds that Mr. Mason's reliance on the form executed by Mr. Carpenter when he entered the Crystal Care Center is unfounded. As noted above, the DNR and Full CODE status options were explained to Mr. Carpenter only in the context of his suffering from a heart attack. At no time did Tiffany Behrendsen discuss with Mr. Carpenter the options in the context of terminal illness or if he were in a permanently unconscious state. Further, for a declaration to apply when a patient is in a terminal condition or a permanently unconscious state, R.C. 2133.02(A)(2) provides that the declaration shall use either or both of the terms "terminal condition" and "permanently unconscious state" and shall otherwise define or explain those terms. In this case, the subject form and the statement contained therein by Mr. Carpenter do not comply with that standard.

{¶ 16} Next, the court finds that Ernest Carpenter has shown by clear-and-convincing evidence that the decision to use or continue life-sustaining treatment is not consistent with the previously expressed intention of Mr. Carpenter. Furthermore, the court finds that, based on the testimony of Ernest Carpenter and Tammy Schultie, there is clear-and-convincing evidence that the decision to use or continue life-sustaining treatment is not consistent with the type of informed consent decision that Mr. Carpenter would have made with respect to the use or continuation, or the withholding or withdrawal, of life-sustaining treatment should he subsequently be in a terminal condition or a permanently unconscious state, whichever applies, and no longer able to make informed consent decisions. See *In re Guardianship of Myers* (1993), 62 Ohio Misc.2d 763, 610 N.E.2d 663.

{¶ 17} Any further life-prolonging procedures would be futile and cruel. Mr. Carpenter is terminal, with no chance for meaningful recovery. The applicable

law, medical judgment, and common sense demand that Mr. Carpenter be allowed to die from the underlying cause of his condition.

{¶ 18} IT IS THE ORDER OF THE COURT that Akron City Hospital, in consultation with Ernest Carpenter, devise and implement a treatment plan which will keep Mr. Carpenter comfortable with no surgical procedures to prolong the dying process.

{¶ 19} IT IS SO ORDERED.

Judgment accordingly.